UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| STORAGE MASTERS JYP, LLC | ) | Case No.  6:12-bk-00044-KSJ |
| Fka JYP Self Storage LP, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |

| | | |
|---|---|---|
| In re | ) | |
| STORAGE   MASTERS   GOLDENROD, | ) | |
| LLC | ) | Case No.  6:12-bk-00045-KSJ |
| | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |

| | | |
|---|---|---|
| In re | ) | |
| EAT 2005-022, LLC | ) | |
| dba Storage Masters Silver Star LLC | ) | Case No.  6:12-bk-00046-KSJ |
| | ) | Chapter 11 |
| Debtor[s]. | ) | |
| | ) | |
| _____ | ) | |

| | | |
|---|---|---|
| In re | ) | |
| STORAGE MASTERS O'FALLON, LLC | ) | |
| | ) | Case No.  6:12-bk-00047-KSJ |
| Debtor[s]. | ) | Chapter 11 |
| | ) | |
| _____ | ) | |

| | | |
|---|---|---|
| In re | ) | |
| STORAGE MASTERS CHESTERFIELD, | ) | |
| LLC | ) | Case No.  6:12-bk-00048-KSJ |
| | ) | Chapter 11 |
| Debtor[s]. | ) | |
| | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION DENYING CONFIRMATION</u>

Each of the five jointly administered debtors owns a self-storage facility. Most of these

properties have struggled financially for years but have always managed to pay their mortgage

payments until recently. Loans secured by four of the five storage facilities, and unsecured as to

the fifth one, have matured. Debtors are unable to pay the outstanding principal balance or to refinance the debt, and each debtor filed for bankruptcy to stay foreclosure. Debtors have proposed a joint plan of reorganization that, among other things, substantively consolidates the five debtors to achieve a modification of the principal creditor's debt using the cram down procedures in § 1129(b) of the Bankruptcy Code.[1] This is not a proper use of substantive consolidation, and debtors' plan will not be confirmed.  In addition, debtors' plan violates § 524(e) by proposing to release an insider's guaranty, and the debtors fail to meet all requirements of § 1129(a).  Confirmation of debtors' proposed plan of reorganization is denied.

Debtors are five single-member LLCs formed and owned by a common principal, Mr. John Burrows. Each debtor owns one personal storage facility:[2]

| Debtor | Storage Facility Location | Rentable SF | Units |
|---|---|---|---|
| Storage Masters JYP, LLC | 2783 N. John Young Parkway, Kissimmee, FL | 74,451 | 649 |
| Storage Masters Goldenrod, LLC | 155 S. Goldenrod Road, Orlando, FL | 79,560 | 725 |
| Storage Masters Silver Star, LLC | 8225 Silver Star Road, Orlando, FL | 94,126 | 697 |
| Storage Masters Chesterfield, LLC | 16824 Chesterfield Airport Rd., Chesterfield, MO | 120,733 | 856 |
| Storage Masters O'Fallon, LLC | 2601 East Terra Lane, O'Fallon, MO | 101,140 | 656 |

To facilitate the purchase of the five storage facilities, debtors executed numerous separate loans with First Bank.[3] Mr. Burrows personally guaranteed each of the loans.[4]

The First Bank loans were secured by four of the five storage facilities, but were not secured by the O'Fallon property.  Storage Masters O'Fallon, LLC is a maker of the outstanding

---

[1] All references to the Bankruptcy Code shall refer to 11 U.S.C. § 101 *et seq.*
[2] Doc. No. 3 at 1-2.
[3] First Bank extended the following 8 loans: $2,800,000 term loan made to Chesterfield on April 19, 2001; $1,500,000 revolving loan made to Chesterfield on May 5, 2005; $1,025,000 term loan made to Chesterfield on January 26,2006; term loan made to Chesterfield on March 31, 2006; $5,300,000 term loan made to Goldenrod on April 1, 2005; $5,300,000 term loan made to Silver Star on August 30, 2005; $4,664,000 term loan made to JYP on March 10, 2006; and $1,000,000 term loan made to O'Fallon on November 7, 2000. Doc. No. 138 Exhibit 5.
[4] Mr. Burrows and his wife personally guaranteed the loans. For simplicity, the Court will refer to just Mr. Burrows' guaranty.

loan extended by First Bank but the property owned by O'Fallon is encumbered by a first and second mortgage held by Reliance Bank (the "Reliance Loan"). As such, the O'Fallon obligation is unsecured. Mr. Burrows also personally guaranteed the Reliance Loan.

In addition to the properties owned by the debtors, Mr. Burrows owns three other entities whose sole assets are self-storage facilities: Storage Masters Plano, LLC; Storage Masters Denver, LLC; and Storage Masters St. Charles, LLC. None of these entities are in bankruptcy. Mr. Burrows is the sole managing member of the debtors and the non-debtor storage entities. He also owns the management company Storage Masters Management, LLC, which manages all eight storage facilities. Each debtor is taxed as a sole proprietorship, maintains separate operating accounts and financial records, and each pays Storage Masters Management, LLC (Mr. Burrows) a $1,300 management fee for bookkeeping, administration, and operations assistance. The JYP, Silver Star, Goldenrod, and Chesterfield debtors each pay Mr. Burrows a monthly salary of $2,083.25. The O'Fallon debtor pays Mr. Burrows a monthly salary of $2,250.00.

Despite Mr. Burrows' 28 years of knowledge and experience in the field, the three Florida debtors have never been profitable. The global recession further impaired the profitability of the personal storage industry and detrimentally affected the five debtors. When debtors were unable to refinance the loans or to sell any of the properties upon the loans' initial maturities, First Bank extended the maturity dates of debtors' numerous loans.[5] At the end of 2009, debtors entered into another loan modification with First Bank that consolidated all of the loans into a single loan and extended the maturity date of the loan to January 5, 2012. First Bank split the loan into two notes, an "A" note and a "B" note totaling $20,700,000.00[6].

Shortly after this last loan modification, in March, 2011, First Bank sold its interest in the consolidated loan (both notes) to Andover Properties, LLC ("Andover"), a New York based

---

[5] Doc. No. 49 at 5 and n. 6.
[6] The $11,200,000 "A Note" was amortized over 25 years at 6.5%; the $9,500,000 "B Note" accrued interest at 6.5%, with no payments due until maturity.

owner/operator of storage facilities nationwide (hereinafter the "Andover Loan"). Andover is a competitor of the debtors. The Andover Loan matured as scheduled on January 5, 2012, with an outstanding principal balance of $22,084,527.27.[7] The O'Fallon debtor, in addition, owed $3,862,745.56 to Reliance Bank under the Reliance Loan.[8] The debtors each filed separate Chapter 11 petitions on January 3, 2012. Upon request, the Court granted joint administration of the five bankruptcies for administrative convenience purposes only.[9]

## The Proposed Plan

The jointly administered debtors filed one joint plan of reorganization (the "Plan") and one disclosure statement.[10] The Plan calls for the substantive consolidation of the five debtors. Upon the effective date, debtors will merge into a new reorganized debtor, MCOCO, LLC, owned and managed by Mr. Burrows.[11] MCOCO, LLC will buy debtors' assets for $600,000.[12] The defunct debtors then will use the $600,000 to pay down Andover's $22 million claim.[13] The Plan estimates the value of Andover's collateral is approximately $20 million, as compared to Andover's $22 million claim. It places Andover's secured and unsecured claims into two separate classes, although it proposes to treat those classes the same, repaying both in full over 60 months in monthly principal and interest payments at 5% based on a 30-year amortization. A final balloon payment of approximately 88% of the principal balance at confirmation will be owed to Andover at the end of the five-year Plan.[14] The $600,000 used to fund the Andover pay

---

[7] Doc. no. 138 at 2.
[8] Id.
[9] Debtors' Ex Parte Motion for Joint Administration (Doc. No. 4); Order Granting Motion for Joint Administration of Cases (Doc. No. 15). Lead Bankruptcy Case is 12-bk-00044-KSJ.
[10] Doc. Nos. 79, 80.
[11] Doc. No. 79 at 9; Doc. No. 119 at 2.
[12] Debtors' Exhibit No. 3 at 3.
[13] Id.
[14] Doc. No. 138.

down will come from Mr. Burrows' personal funds;[15] Mr. Burrows has offered to forego his management fees if necessary to ensure Andover is paid according to the Plan.[16]

The Plan also calls for the cross-collateralization of the O'Fallon property (security of the Reliance Loan) with the St. Charles facility, a non-debtor asset.[17] Reliance, as the sole secured creditor of O'Fallon, will benefit substantially by receiving additional valuable collateral.  Debtors, however, do not plan on cross-collateralizing any portion of the debtors' obligation to Andover with any of the assets of the non-debtors.[18]  Mr. Burrows testified, however, he will use the revenue generated from other storage facilities in St. Charles, MO, Plano, TX, and Denver, CO, to fund the reorganization as necessary.[19]

The Plan modifies the Reliance Debt by reducing Reliance's $3.8 million secured claim by $406,503.00[20] and by extending the maturity date by 36 months. MOCOC, LLC will have the option to extend Reliance's maturity date by another 24 months if it achieves a 1.15:1 debt service ratio after the initial three years. MCOCO, LLC will pay Reliance principal and interest at 5.5% over the initial three year term based on a 20-year amortization, and also will pay Reliance additional principal reduction payments of $50,000 each December until Reliance is paid in full. At the end of the first 36 months, MCOCO, LLC must make a final balloon payment of approximately 77% of Reliance's claim. If the Reliance loan is extended for another two years, the final balloon payment will be reduced to approximately 67% of Reliance's initial claim.

---

[15] Mr. Burrows testified that he plans to take out a loan on his life insurance policy to fund a portion of the plan. Testimony of Mr. Burrows, May 24, 2012.

[16] *Id.*; Debtors' Exhibit No. 3, Exhibit B.

[17] Doc. No. 138 at 10.

[18] *Id.*

[19] Doc. No. 3 at 2; Testimony of Mr. Burrows, May 24, 2012. The Plan does not cross-collateralize the revenues of the debtors with those of the non-debtors or memorialize debtors' avowal to use non-debtor assets in any way.

[20] The restructured note for the O'Fallon mortgage will be reduced by $406,503, and the restructured note of the non-debtor St. Charles mortgage will be increased by $406,503.00 such that the loan to value of both notes will be approximately 62%. In addition, the debt of Storage Masters St. Charles (non-debtor) and Storage Masters O'Fallon (debtor) will be cross-collateralized.

In addition to the restructuring of the Andover and Reliance Debts, the Plan imposes an injunction against the enforcement of Mr. Burrows' personal guaranty, provided MOCOC, LLC complies with all provisions in the Plan.[21] The guaranty will continue to have full force and effect should MCOCO, LLC default on its obligations under the Plan.[22] The effect of the guaranty release at the end of the Plan term is to release Mr. Burrows from his obligation to pay post-petition interest, costs and fees to Andover (an under-secured creditor).  These obligations would otherwise be enforceable in state court notwithstanding debtors' discharge.

Andover, an impaired under-secured creditor, objects to confirmation of the Plan because it: (1) improperly substantively consolidates debtors, (2) inappropriately discharges Mr. Burrows' guaranty, (3) fails to classify Andover's secured and unsecured claims separately, and (4) fails to meet the confirmation requirements of § 1129(a) and (b).[23] The Court addresses Andover's objections to confirmation below.

**Debtors May Not Use Substantive
Consolidation for the Sole Purpose of Achieving Cram Down**

A Chapter 11 bankruptcy often results in some creditors not getting paid in full. The Code provides certain protections to ensure that those impaired creditors receiving less than their full claims are treated fairly.[24] If a class of impaired creditors rejects a debtor's proposed plan, a court may only "cram down" the plan over the impaired creditor's objections if at least one impaired creditor accepts the plan and the plan conforms to all of the other provisions outlined in § 1129(a) and (b).[25] "By providing a rigid set of obligations for the court in approving a plan in cram down, Chapter 11 [prevents] a debtor from unfairly discriminating

---

[21] Debtors' Exhibit No. 2 at 12.
[22] *Id.*
[23] Doc. No. 117.
[24] *In re Lett*, 632 F.3d 1216, 1219 (11th Cir. 2011).
[25] *Id.* (referencing § 1129(a)).

against a specific creditor or group of creditors, [and prevents] obstinate creditors from holding up the approval of an otherwise sound plan of reorganization."[26]

In this case, Andover is the sole "impaired" creditor as to four of the debtors JYP, Goldenrod, Chesterfield, and Silver Star (the "Andover Debtors").   Andover has rejected debtors' Plan. There are no other impaired creditors to accept these debtors' Plan. Therefore, if each Andover Debtor were treated separately under a separate plan of reorganization, four of the five debtors' plans would fail for lack of support.[27] Only the O'Fallon debtor would be able to cram down Andover because Reliance, an impaired creditor as to that debtor only, has accepted the Plan.

In an attempt to avoid the impact of Andover's rejection of the Plan, debtors' Plan proposes to substantively consolidate all five debtors under one plan of reorganization.   The effect would be to count Reliance's acceptance vote as that of the desperately needed impaired accepting class required to cram down the Plan on Andover. This is not an appropriate use of substantive consolidation.

Substantive consolidation pools the assets and liabilities of two or more related debtors, eliminates their inter-corporate liabilities, and satisfies the liabilities of the consolidated debtors from a common pool of assets.[28] Courts use substantive consolidation as a tool to ensure the equitable treatment of all creditors of a consolidated debtor group[29] by redistributing the debtors' wealth among the creditors of the various consolidated entities. "Because of the dangers in forcing creditors of one debtor to share on a parity with creditors of a less solvent debtor, . . . substantive consolidation 'is no mere instrument of procedural convenience but a

---

[26] *In re Lett*, 632 F.3d at 1220.

[27] 11 U.S.C. § 1128(a)(8) & (10).

[28] *Eastgroup Properties v. S. Motel Ass'n, Ltd.*, 935 F.2d 245, 248 (11th Cir. 1991) (citing *In re Augie/Restivo Baking Co.*, 860 F.2d at 518; *Holywell Corp. v. Bank of New York*, 59 B.R. 340, 347 (S.D.Fla.1986)).

[29] *Eastgroup*, 935 F.2d at 248 (citing *In re Murray Indus.*, 119 B.R. 820, 830 (Bankr.M.D.Fla.1990)).

measure vitally affecting substantive rights,' [and should] be used sparingly."[30] A court must allow consolidation of debtor entities only when its benefit outweighs its harm.[31]

The Eleventh Circuit has scrutinized the pros and cons of substantive consolidation and has set forth the requirements for its use in the hallmark case of *Eastgroup Properties v. South Motel Association.*[32]   *Eastgroup* first requires the proponent of substantive consolidation to make a prima facie showing that "(1) there is *substantial identity* between the entities to be consolidated; *and* (2) consolidation is *necessary* to avoid some harm or to realize some benefit."[33]

A substantial identity of debtor entities must be demonstrated by the absence of corporate formalities or by commingling of assets.[34]   Whether a substantial identity exists among the entities is a fact-specific undertaking, and a court may consider one or more of the following factors, none of which are determinative alone:

> (1) The presence or absence of consolidated financial statements.
> (2) The unity of interests and ownership between various corporate entities.
> (3) The existence of parent and intercorporate guarantees on loans.
> (4) The degree of difficulty in segregating and ascertaining individual assets and liabilities.
> (5) The existence of transfers of assets without formal observance of corporate formalities.
> (6) The commingling of assets and business functions.
> (7) The profitability of consolidation at a single physical location.[35]

If the prima facie showing is made, a presumption that creditors have relied on the collective credit of the debtors (rather than on the credit of only one of the entities involved) arises.[36]   The burden then shifts to an objecting creditor to show "that (1) it has relied on the separate credit of one of the entities to be consolidated; and (2) it will be prejudiced by

---

[30] *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d at 518.
[31] *Eastgroup* 935 F.2d at 249.
[32] 935 F.2d 245, 249 (11th Cir. 1991)
[33] *Eastgroup* 935 F.2d at 249 (citing *In re Murray Indus.*, 119 B.R. at 829; *Matter of Lewellyn,* 26 B.R. 246, 251 (Bankr. S.D.Iowa 1982); *In re Snider Bros.,* 18 B.R. at 238)).
[34] *In re Reider*, 31 F.3d 1102, 1107 (11th Cir. 1994).
[35] *Eastgroup,* 935 F.2d at 249 (citing the test in *In re Vecco Construction Indus.,* 4 B.R. 407, 409 (Bankr. E.D.Va.1980)).
[36] *Id.* (citing *Matter of Lewellyn,* 26 B.R. at 251-52).

substantive consolidation."[37] Then, "the court may order consolidation only if it determines that the demonstrated benefits of consolidation 'heavily' outweigh the harm."[38]

Debtors claim they can demonstrate a substantial identity exists amongst them because they share common ownership (Mr. Burrows) and common management (Storage Masters Management, LLC), they commingle business functions, they share a common liability to Andover,[39] and because debtors failed to observe corporate formalities between themselves.[40] Debtors also argue substantive consolidation is the only way they can confirm their Plan,[41] and "Reliance Bank needs this reorganization to keep its significant claims against O'Fallon from going into default."[42] Lastly, debtors argue Andover's predecessor, First Bank, and Reliance relied on debtors' inter-relatedness, rather than on the separate credit of each individual debtor, when they extended credit to debtors, as evidenced by Andover's purchase of the consolidated loan from First Bank.[43]

Andover objects to the substantive consolidation, claiming it is a manipulation of the cram down process and not appropriate because there is no substantial identity in the debtors, particularly between the Andover Debtors and the O'Fallon debtor.[44] Andover argues consolidation does considerably more harm than good because the Plan unfairly discriminates against Andover in favor of Reliance and causes Andover to bear the entire risk of default during the term of the Plan while Reliance enjoys better treatment. And Andover argues the Plan leaves Mr. Burrows free to pillage any remaining equity in the reorganized debtor.[45]

---

[37] *Eastgroup*, 935 F.2d at 249 (citing *In re Auto-train,* 810 F.2d at 276).
[38] *Eastgroup*, 935 F.2d at 249.
[39] *Id.* at 4. Debtors argue "in a very real sense, that one common debt already consolidates these five entities, marrying them all with one $22 million obligation."
[40] Doc. No. 80 at 10.
[41] Testimony of Mr. Burrows, May 24, 2012; Doc. No. 127 at 4 (stating "[a]ny attempt to reorganize any of these five entities would be meaningless if attempted separately.").
[42] Doc. No. 127 at 3–4.
[43] Doc. No. 127.
[44] Doc. No. 136 at 6-10.
[45] Andover's Objection to Debtors' Motion for Substantive Consolidation, Doc. No. 139.

The Court finds substantive consolidation is not necessary, appropriate, or equitable in this case. First and foremost, debtors have not established a prima facie showing that they share a substantial identity. In fact, the undisputed facts establish debtors are separate and distinct entities.

Debtors and Andover jointly stipulated to the following facts:

- Debtors each entered into individual loan documents with Andover (f/k/a First Bank) prior to the consolidation of the loans into the A Note and B Note (the "Original Loans").
- Andover is a creditor of all five related debtors, but only holds a secured claim against the properties held by the JYP, Goldenrod, EAT, and Chesterfield debtors.
- Andover holds an *unsecured* claim against the O'Fallon property.
- The O'Fallon property is encumbered by a first and second mortgage in favor of Reliance Bank.
- Each of the debtors maintains separate operating accounts, payroll accounts, and tax accounts at Regions Bank.
- Debtors maintain separate financial records.
- Debtors comply with all organizational formalities to maintain separate existences.
- Debtors own separate and distinct assets.
- Debtors' assets are not commingled or intertwined in any manner.
- While debtors may have transferred funds amongst themselves from time to time to cover shortfalls and pay common expenses, at all times they maintained organizational formalities.
- Intercompany transfers among the debtors have been fully reconciled and the transfers have been identified by the debtors.
- Debtors maintain wholly separate financial records and distinct cash management systems.
- Debtors routinely pays their own liabilities out of their respective separate funds.
- The debtors have no difficulty in segregating and ascertaining their individual assets and liabilities.
- Each of the debtors provides its accountant with separate financial records for purposes of tax return preparation and each entity is separately invoiced for work performed.
- Each debtor possesses a unique tax identification number.
- Debtors have separate operating agreements and were formed on different dates.
- Debtors each employ their own onsite managers charged with directing the day to day operations of the entity.
- Debtors retain their respective identities in all internal and external communications, representations, leases and contracts.
- Debtors use separate invoices and checks.
- Debtors operate at different physical locations and are not capable of consolidating to one single physical location.

- Debtors maintain separate financial statements in compliance with generally accepted accounting principles.
- Debtors conduct business in their own names and no confusion exists among creditors regarding the question of which entity owns which asset.[46]

Debtors also made the following statements in their motion for joint administration:

- "While debtors constitute *separate and distinct entities*, the issues that will be addressed in these bankruptcy cases will be related and overlapping."
- "The rights of respective creditors of the Debtors will not be adversely affected by the proposed joint administration because the Debtors will continue as separate and distinct legal entities and will continue to maintain separate books and records."
- "Moreover, each creditor may still file its proof of claim against a particular estate." [47]

These undisputed facts clearly indicate no substantial identity exists between any of the debtors, notwithstanding Mr. Burrows' common ownership and management of all debtors. Debtors do not maintain consolidated financial statements.   There are no parent or inter-company guarantees, commingling of assets, or consolidation of property locations.  No debtor paid the obligations of any other debtor without due consideration.  Debtors never failed to observe corporate formalities when transferring funds, nor do they suggest they have any difficulty in segregating their assets or liabilities. Each debtor filed a separate bankruptcy schedule that included a separate rent roll, separate profit and loss budget, separate check register, separate financial report,[48] and separate bank account information.[49] Mr. Burrows kept meticulous financial records for each debtor entity. The Andover loan is a secured debt of the four Andover Debtors; but as to the O'Fallon debtor, it is an unsecured debt. The common creditor is not enough to justify substantial consolidation of all five debtors at Andover's expense.

Ignoring Andover's concerns and the lack of substantial identity, debtors argue the Court should confirm the Plan anyway because no provision of the Code prohibits a debtor from

---

[46] Doc. No. 138 at 5-6.
[47] Doc. No. 4 at 6–7.
[48] Doc. Nos. 69-73.
[49] Doc. Nos. 42-46.

using substantive consolidation offensively to manipulate the cram down requirements of § 1129(a)(10) and § 1129(b), namely, to create an impaired accepting class.[50] However, the absence of an express prohibition does not translate into an approval. The Eleventh Circuit articulated the contours of substantive consolidation in *In re Reider*.[51]   The purpose of consolidation is to prevent an injustice to *creditors,* where consolidated debtors comingled funds or disregarded corporate formalities.[52] As some courts have explained, "[c]orporate disregard as a fault may lead to corporate disregard as a remedy."[53] Substantive consolidation is a creditor's remedy not a debtor's sword.[54]

Because substantive consolidation of debtors *vitally* affects a creditor's rights, it may not be used as a tool of mere convenience or manipulation.[55]   A proponent first must prove the existence of a substantial identity among debtors, which may be shown *only* by the commingling of assets or corporate disregard — circumstances that do not exist here.[56] Debtors simply are attempting substantive consolidation because it is the only way they can create an impaired accepting class and achieve confirmation of their Plan over Andover's objections. This is an improper use of the remedy of substantive consolidation.  Just as creditors may not use substantive consolidation tactically without proving they relied on the interrelated credit of a

---

[50] Doc. No. 127 at 5; Hearing May 24, 2012.

[51] 31 F.3d 1102 (11th Cir. 1994).

[52] *In re Reider*, 31 F.3d at 1106-07 (referencing *In re Continental Vending Machine Corp.*, 517 F.2d 997 (2d Cir. 1975); *In re Flora Mir Candy Corp.*, 432 F.2d 1060 (2d Cir.1970); *Chemical Bank New York Trust Co. v. Kheel*, 369 F.2d 845 (2d Cir.1966); *Soviero v. Franklin National Bank of Long Island*, 328 F.2d 446 (2d Cir.1964)).

[53] *In re S&G Financial Services of South Florida, Inc.*, 451 B.R. 573, 580 (Bankr. S.D. Fla. 2011) (citing *In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005)).

[54] *In re Owens Corning*, 419 F.3d at 205-206 (noting "[p]rior to substantive consolidation, other remedies for corporate disregard were (and remain) in place," and "substantive consolidation is a remedy "for corporate disregard.").

[55] *In re Reider*, 31 F.3d at 1107 (contrasting substantive consolidation with joint administration, and noting that, by contrast, substantive consolidation "is no mere instrument of procedural convenience . . . but a measure vitally affecting substantial rights," and that little weight should be given to the fact that two debtors are jointly administered).

[56] *In re Reider*, 31 F.3d at 1107 (stating "substantial identity of the entities [to be consolidated] must be demonstrated by the absence of corporate formalities or by commingling of assets."). The joint administration of debtors is not enough to prove substantive consolidation is proper. *Id.* at 1111.

group of debtors,[57] debtors here may not use substantive consolidation strategically to manipulate voting classes for purposes of cram down.

### The Guarantee Release Violates § 524(e)

Debtors' plan also fails for other reasons including the improper reliance of Mr. Brown's guarantee.  One of the core provisions of debtors' Plan is the release of Mr. Burrows, a non-debtor, from his contractual guaranty on the loans made by Andover and Reliance Bank after the reorganized debtor, MCOCO, LLC, completes all payments under the Plan.[58]  Andover objects to the release provision because it violates § 524(e) of the Code,[59] which states, "except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."[60]  In other words, Andover argues that Mr. Burrows' guaranty obligations must remain in force even though the discharge injunction will prevent Andover from pursuing further claims against any of the debtors.

Upon confirmation of a Chapter 11 plan of reorganization, the discharge injunction in § 1141(d) bars any future collection of a debtors' debts.[61]  A discharge applies only to the claims against a bankrupt debtor, but confirmation of a debtor's plan does not discharge the obligations of a third-party guarantor.[62]  Unless a court orders otherwise, creditors are generally free to pursue all available remedies against other non-debtors or entities obligated for any of the discharged debt.[63]  If the Court allows the release of Mr. Burrows' guaranty, Andover will lose its contractual right to recover post-petition interest, costs, and fees that debtors will be excused from paying to Andover, an under-secured creditor, under § 506(b).[64]

---

[57] *In re Owens Corning* , 419 F.3d at 211.
[58] Debtors' Joint Plan of Reorganization, Debtors' Exhibit No. 2 at 12-13.
[59] AG/Andover's Memorandum of Law in Support of Objections to Confirmation, Doc. No. 142 at 8-11.
[60] 11 U.S.C. § 524(e).
[61] 11 U.S.C. § 1141(d). *In re Transit Group, Inc.,* 286 B.R. at 815.
[62] *In re Sure-Snap Corp.,* 983 F.2d 1015, 1019 (11th Cir. 1993).
[63] *Id.*; *In re Transit Group, Inc.*, 286 B.R. at 815.
[64] Andover is not entitled to collect post-petition interest, costs, or fees from the debtors because Andover is under-secured, and only over-secured creditors are entitled to these amounts.  *See* 11 U.S.C. § 506(b).

The scope of allowable non-debtor releases is extremely narrow.[65] In *In re Transit Group*, this Court held § 524(e) does not bar non-debtor releases in appropriate circumstances, where the releases are necessary to carry out the provisions of the Bankruptcy Code as allowed by § 105.[66] Thus, the proponent of a third-party release must prove the release is fair, necessary for reorganization, and justified by extraordinary circumstances.[67] Courts evaluate each request for a third-party release on a case-by-case basis[68] by considering a number of factors, including:

> (1) Whether the debtor and the third party share an identity of interest, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;
> (2) Whether the non-debtor has contributed substantial assets to the reorganization;
> (3) Whether the injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;
> (4) Whether the impacted class, or classes, has overwhelmingly voted to accept the plan;
> (5) Whether the plan provides a mechanism to pay for all, or substantially all, of the class, or classes, affected by the injunction;
> (6) Whether the plan provides an opportunity for those claimants who choose not to settle to recover in full, and;
> (7) Whether the bankruptcy court made a record of specific factual findings that support its conclusions.[69]

Releases of a non-debtor officer or director from future liability are particularly hard to come by.  Plans including such releases will not be confirmed unless the debtor can provide some extraordinary justification.[70]

Debtors have argued that the requisite unusual and extraordinary circumstances are present because Mr. Burrows has proposed to inject $600,000 of his own money into the plan and cover any operational shortfalls.[71] Debtors also argue the releases are necessary because Andover's pursuit of the guaranty would interfere with the Plan and "stymie the efforts of Mr. Burrows to pay Andover in full."[72]

---

[65] *In re Transit Group*, 286 B.R. at 817–818.
[66] *Id*. at 816
[67] *Id*.
[68] *Id*.
[69] *Id*.
[70] *Id. at* 818.
[71] Doc. No. 164 at 21-23.
[72] *Id*. at 22.

Debtors face an uphill battle to show that releasing Mr. Burrows' guarantees is fair and necessary, that his contribution to the Plan is substantial, and that the circumstances are markedly unusual. First, the Court is not convinced that the release is essential to the reorganization. Mr. Burrows testified that he will not be able to obtain refinancing at the end of the plan term if the guaranty is not released.[73] According to Mr. Burrows, no lender would refinance the Andover Loans upon maturity because of Mr. Burrows' potential guaranty liability.[74] But, other sources of capital exist; for example, Mr. Burrows might contribute the approximate $5 million in equity he has in his other properties to satisfy any guaranty liability.

The Court concludes releasing the guaranty is unfair to Andover. Andover purchased the loans as negotiated by Mr. Burrows and Andover's predecessor First Bank. The negotiated loan terms include the guaranty, which minimizes the risk for the lender by holding Mr. Burrows responsible should the companies not be able to repay their debt. This Court will not renegotiate the loan agreement for Mr. Burrows (a non-debtor). Mr. Burrows could have filed a Chapter 11 case along with his debtors, but he did not.[75]

The Court cannot make a determination as to whether Mr. Burrows' contribution is substantial in relation to his assets because Mr. Burrows has not provided any personal financial information to the Court; instead he seeks to receive the discharge benefit of debtors' Plan without having to go through the financial scrutiny of the bankruptcy process himself.[76] Nor can the Court determine whether the $600,000 contribution is substantial in relation to the value of the release. The parties have not quantified this value.

Moreover, this Court can "rarely, if ever . . . envision a [situation] where a related affiliate of the debtor is entitled to a non-debtor release."[77] Releasing every insider of a single-

---

[73] Testimony of Mr. Burrows, May 24, 2012.
[74] *Id.*
[75] *See In re Transit*, 286 B.R. at 820.
[76] The Court has no knowledge of Mr. Burrow's personal finances or net worth that would enable it to make a decision as to whether the contribution of $600,000 is substantial.
[77] *Id.*

asset debtor who contributes cash to keep his investment would gut the provisions of § 524(e); courts must limit the use of non-debtor releases to unusual circumstances. Mr. Burrows has not explained why his situation is unique. There is nothing extraordinary about a single member owning and guaranteeing a number of bankruptcy remote, single asset real estate companies. In contrast to the situation in *Transit*, where Court released *non-insiders* from any future lender liability in exchange for substantial debtor-in-possession financing, exit financing, and the subordination of $90 million of unsecured debt, Mr. Burrows' contributions do not exceed "mere self-preservation."[78]

### Debtors' Plan does not Violate § 1122(a)

Andover argues that debtors' Plan is not confirmable because it violates §1122(a) by proposing to treat Andover's secured and unsecured claims similarly.[79] Neither party disputes Andover's claim is under-secured to some extent.[80] Without specifically referring to debtors' most recent valuation, the Plan places Andover's secured claim in Class V and its unsecured claim in Class VII.[81] The Plan then proposes to provide the same treatment to Class VII as it gives to Class V, which is to allow Andover to keep its lien on the properties and to pay Andover's claim in full.[82] The Court finds nothing wrong with this treatment.

Section 1122 prohibits dissimilar claims from being classified together.[83] Unsecured and secured claims of a creditor are *always* considered unique because they come with distinctive rights under the Code.[84] They must be independently classified. Debtors' classification of

---

[78] *In re Transit*, 286 B.R. at 818-820.
[79] Doc. No. 142 at 12-13.
[80] Doc. No. 138 at ¶ 81, which reads: As of the Petition date, the AG/Andover Claim exceeded the value of the assets securing the AG/Andover Claim by more than $1,000,000."
[81] Debtors' Exhibit No. 2 at 6. According to debtors' liquidation analysis, Andover's secured claim in Class V is $20,116,081, and Andover's unsecured claim in Class VII is $2,017,409.24 (Andover's proof of claim ($22,133,490.24) less debtors' value ($20,116,081)). Doc. No. 133 at 9.
[82] Debtors' Exhibit No. 2 at 6.
[83] *In re SM 104 Ltd.,* 160 B.R. at 219 (noting "Section 1122(a) allows joint classification of claims *only* if the claims are substantially similar in terms of their legal rights.").
[84] *FGH Realty Credit Corp. v Newark Airport/Hotel Ltd. P'ship,* 155 B.R. 93, 99 (D.N.J. 1993); *In re D & W Realty Corp.,* 165 B.R. 127 (S.D.N.Y. 1994); *In re 266 Washington Associates,* 141 B.R. 275 (Bankr. E.D.N.Y. 1992); *In re E.I. Parks No. 1 Ltd. Partnership,* 122 B.R. 549 (Bankr. W.D. Ark.1990). The similarity of claims is

Andover's secured and unsecured claims into different classes complies with this basic rule, which is meant to prevent a debtor's gerrymandering of votes to achieve confirmation.[85]

Andover has not articulated how debtors' similar treatment of Andover's secured and unsecured classes has caused any harm; and, in fact, no harm has been done. Class V and Class VII maintained their voting rights, and each class cast independent ballots rejecting debtors' Plan of reorganization.[86] Debtors' proposal to treat Class V and Class VII similarly does not violate § 1122.

### Debtors' Plan Violates Several Provisions of § 1129(a)

A debtor's plan must satisfy *all* of the requirements in § 1129(a) for a court to confirm a plan. Debtors bear the burden to prove each element of § 1129(a) is satisfied.[87] Here, debtors' Plan fails to meet the requirements of § 1129(a)(7), (8), and (10).

### (1) The Plan Fails the Best Interest of Creditors Test in § 1129(a)(7)

Debtors' Plan fails the "best interest" test because it provides Andover less than what Andover would receive if all debtors were liquidated pursuant to Chapter 7. This test is found in § 1129(a)(7), which reads:

> With respect to each impaired class of claims or interests – (A) each holder of a claim or interest of such class (i) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

Under this "best interest of creditors" test, a plan proponent must show that each class of impaired creditors will receive at least as much under a proposed plan as they would receive if all of a debtor's assets were liquidated under Chapter 7.[88] The test is "designed to protect

---

based on the legal status of the claim, not on the creditor's status in relation to the debtor. *In re Piece goods Shops Co., L.P.*, 188 B.R. 778 (Bankr. M.D.N.C. 1995).

[85] *In re SM 104 Ltd.*, 160 B.R. at 217 (noting "the Fifth Circuit held that 'one clear rule' has emerged from the otherwise muddled § 1122 case law: 'thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan'" (citing *In re Greystone*, 995 F.2d 1274, 1279 (5th Cir. 1991)).

[86] Doc. No. 132.

[87] *In re New Midland Plaza Associates*, 247 B.R. 877, 883 (Bankr. S.D. Fla. 2000).

[88] *In re Adelphia Communications Corp.*, 361 B.R. 337, 365 (S.D.N.Y. 2007).

individual creditors even in the face of majority support for a plan"[89] and requires debtors in this case to show that the net present value of the Plan payments is greater than the current liquidation value of the collateral securing Andover's loan.[90]

Under debtors' Plan, Andover will receive less in today's dollars than it would receive if the assets were liquidated, even though the Plan proposes to pay Andover's secured and unsecured claims in full over time. Under the proposed Plan, Andover will receive $600,000 on the effective date, and the remainder of its $22 million claim (both secured and unsecured) will be paid over five years. Notably, the bulk of Andover's recovery comes in the form of a $19 million balloon payment at the end of five years; and this payment is contingent upon the ability of debtors to refinance the loan at the end of the Plan.  Andover has determined the present value of the stream of payments, using debtors' proposed discount rate of 5%, to be $11,841,488.[91] Debtors have not objected to that calculation.

Under pressure from Andover, debtors now have provided a liquidation value of the storage facilities of $20,116,081,[92] but argue the Plan treatment satisfies the best interest test and provides more to Andover than liquidation because the Plan pays Andover's $22 million claim in full over five years, whereas immediate liquidation would result in a $2 million deficiency claim to Andover.[93]

Debtors' argument fails because it compares the simple sum of what Andover will receive over time with the liquidation value of the properties today, even though the purpose of the best interest test is to compare apples to apples.  Debtors are required to show that the

---

[89] *Id.*

[90] *Corestates Bank, N.A. v. United Chem. Techs., Inc.*, 202 B.R. 33, 56 (E.D. Pa. 1996) (noting "[t]he objecting creditor 'must receive as much under the plan in present value terms as it would if the property were sold today'") (citation omitted). The value of the collateral determines the amount of Andover's allowed secured claim. 11 U.S.C. § 506(a)(1) "An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate in such property."

[91] Doc. No. 142 at 6.

[92] Doc. No. 133 at 9.  Initially, debtors failed to provide any liquidation value for a variety of unsupported reasons. Debtors' confirmation memorandum says liquidating the Andover assets would recover $20,116,081, resulting in a deficiency to Andover of $2,017,409. This amount does not include any recovery under the guarantee, nor does it include trustee fees or liquidation costs.

[93] Doc. No. 164 at 6.

*present value* of the Plan payments over time, *discounted to today's dollars*, is more than the liquidation value of the assets if sold *today*.[94] Andover's rejection of a plan that proposes to pay its claim in full is explained by the risk Andover bears in waiting for recovery from a $19 million balloon payment at the end of the Plan term.  The present value analysis discounts the Plan payments made over time by a discount factor relative to the dilution of Andover's claim that comes from the speculation and delay in repayment.[95]

When the Court compares the present value of the Plan payments, $11 million, with the present-day liquidation value, $20 million, it finds that Andover would receive more in today's dollars if the properties were liquidated than it would receive under the Plan.  Debtors' Plan that proposes to pay Andover's claim in full over time fails to satisfy § 1129(a)(7).

### (2) Debtors' Plan Fails to Comply with § 1129(a)(8) & (10)

A plan complies with § 1129(a)(8) if no classes are impaired, or if *each* impaired class has accepted the proposed plan.[96] Debtors' plan fails the simple requirements of § 1129(a)(8) because Andover, the sole impaired creditor as to each of the Andover Debtors, has rejected debtors' Plan.

Failure under § 1129(a)(8) may be overlooked if, under § 1129(a)(10), at least one impaired class has accepted a plan. This alternative is not available to debtors because, without substantive consolidation, Andover is the *sole* impaired creditor as to each Andover debtor, and no other impaired class exists to accept the Plan. Reliance's approval as to O'Fallon is not relevant to Andover, a separate lender to the other four debtors. Debtors' Plan fails to meet the requirements of 1129(a)(8) & (10).

---

[94] *In re Missavage*, 1995 WL 776931 (Bankr. M.D. Fla. Oct. 17, 1995); *In re Piece Goods Shops Co., L.P.*, 188 B.R. 778, 791 (Bankr. M.D.N.C. 1995); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 761 (Bankr. S.D.N.Y. 1992); *Corestates Bank, N.A. v. United Chem. Techs., Inc.*, 202 B.R. 33, 56 (E.D. Pa. 1996).  The terminology "as of the effective date of the plan" has been interpreted by courts to mean present value of a stream of payments. *Missavage*, 1995 WL 776931 at *1–2.

[95] *In re Missavage*, 1995 WL 776931 (Bankr. M.D. Fla. Oct. 17, 1995); *In re Piece Goods Shops Co., L.P.*, 188 B.R. 778, 791 (Bankr. M.D.N.C. 1995).

[96] 11 U.S.C. § 1129(a)(8).

### The Plan Cannot Reach § 1129(b) Cram Down

Debtors' Plan uses § 1129(b) to cram down the Plan on Andover over Andover's objections. However, all of the requirements of § 1129(a) must be satisfied before a debtor may cram down a plan on a dissenting creditor. The objection of an impaired creditor class may be overlooked if at least one class of impaired creditors has accepted the plan, and the plan does not discriminate unfairly and is fair and equitable to each class of impaired creditors.[97] When both criteria are met, a debtor may cram down the plan on the objecting creditors using the procedures set forth in § 1129(b).[98]

As discussed above, Debtors' Plan fails to satisfy several of the requirements of § 1129(a) that serve as prerequisites to pursuing cram down under § 1129(b). Consequently, debtors do not reach cram down under this Plan.[99]

Given Reliance's approval of the Plan, debtors may seek to cram down a plan on Andover as to the O'Fallon debtor only. If and when debtors propose such a plan, the Court will address any interest rate and unfair discrimination arguments.

### Conclusion

Debtors use Reliance's acceptance of its favored treatment to force substantive consolidation and a cram down on Andover. Notwithstanding debtors' creative efforts, the Plan is not confirmable because it improperly seeks the substantive consolidation of debtors, improperly releases an insider guaranty, and fails to comply with subsections (7), (8), and (10) of § 1129(a).

The court recognizes that Andover purchased the debt from First Bank within a year of maturity, and that Andover, as the debtors' potential competitor, may be in the market to grow its business by acquiring self-storage facilities in the Orlando area. Andover clearly has refused

---

[97] 11 U.S.C. § 1129(a)(10); 11 U.S.C. § 1129(b); *In re Lett,* 632 F.3d at 1219.
[98] *Id.*
[99] The Court will not address other cram down arguments because they are irrelevant given that the debtors have failed to establish one impaired accepting class.

to work with Mr. Burrows, a very sympathetic gentleman, whose debts unfortunately exceed his ability to pay and who faces foreclosure of four of his eight storage facilities and substantial liability on a personal guaranty. But debtors have presented no evidence that would allow this Court to rewrite the promises each debtor made to Andover when it executed a loan to purchase a self-storage facility.   Chapter 11 is not a means for financially distressed debtors to single-handedly rewrite loan agreements.[100] The intent and purposes of Chapter 11 in facilitating a collaborative restructuring must be upheld as to each and every plan confirmed by this Court, including this one.

Debtors' Plan is not confirmable.  Confirmation is denied. A separate order consistent with this Memorandum Opinion shall be entered.

DONE AND ORDERED on July 24, 2012.

KAREN S. JENNEMANN
Chief United States Bankruptcy Judge

---

[100] *In re Windsor on the River Associates, Ltd.,* 7 F.3d at 131. Otherwise, §1129(a)(10) would be "reduced to a nullity." *Id.*